

AO 106 (Rev. 7/87) Affidavit for Search Warrant ▦

# United States District Court

_____Southern_____ DISTRICT OF _____Alabama_____

### In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**information associated with  "jacques.monsi@gmail.com" that is stored at premises controlled by Google, Inc.**

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: *MJ 09-0053-m*

---

I _____**Angelo Fermo**_____ being duly sworn depose and say:

I am a(n)  Senior Special Agent, U.S. Department of Homeland Security,Immigration and Customs Enforcement (ICE) and have reason to believe
<span style="font-size:smaller">Official Title</span>

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

(see above description)

in the _____**Northern**_____ District of _____**California**_____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

**Please see attached -  Attachment "A".**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

 Property that constitutes the fruits, evidence,  and instrumentalities of crimes against the United States
concerning a violation of Title  **18**   United States Code, Section(s)  **371 and Title 50 United States Code, Section 1705** .
The facts to support a finding of Probable Cause are as follows:

**See Attached Affidavit with Attachment "B" hereby incorporated by reference as if fully restated herein.**

Continued on the attached sheet and made a part hereof.          ☒ Yes    ☐ No

Signature of Affiant
**ANGELO FERMO**
**SSA Department of Homeland Security,**
**Immigration and Customs Enforcement**

Sworn to before me, and subscribed in my presence

__May 6,, 2009_____ at     ____Mobile, Alabama____
Date                                                                      City  and  State

Bert W. Milling, Jr.
United States Magistrate Judge
 Name and Title of Judicial Officer          Signature of Judicial Officer

**ATTACHMENT "A"**

This warrant applies to information associated with "jacques.monsi@gmail.com" that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**AFFIDAVIT**

I, Angelo Fermo, being duly sworn, depose and state:

1. I am a Senior Special Agent ("SS/A") of the United
States Department of Homeland Security, Immigration and
Customs Enforcement ("ICE"), currently assigned to the
Office of the Assistant Special Agent in Charge, Mobile,
Alabama.  I have been employed as a Special Agent for
Approximately seven and a half years.  Since that time, I
spent approximately five (5) years assigned to the High
Intensity Drug Trafficking Area (HIDTA) in South Texas
where I was trained and was the affiant on several
applications for Title III wire interceptions, search
warrants, pen registers and arrest warrants.  Since
February 2007 I have been assigned to the ASAC Mobile,
Alabama undercover operations.  I have a Bachelors degree
in Criminal Justice and a Masters degree in Education.

2. I have received specialized training on how to conduct
investigations involving the illegal exportation of
weapons, technology, and other controlled commodities and
on the federal criminal statutes that regulate and, in
certain instances, prohibit the export of U.S. controlled
commodities, including weapons, weapons systems, military
equipment and technology. Along with other special agents
of ICE, I am responsible for investigating and enforcing
violations of the Arms Export Control Act, 22 U.S.C. §
2278, as well as the Export Administration Act of 1979, 50
U.S.C. §§ 2401-2420, and the International Emergency
Economic Powers Act, 50 U.S.C. §§ 1701 et seq., and

relevant regulations. I have participated in several investigations of violations of United States laws relating to the unlawful export from the United States of goods and technology restricted for export for reasons of national security, foreign policy, anti-terrorism, and embargoed destinations.

3. This affidavit is submitted in support of an application for a search warrant authorizing the search of (1) one account controlled by the free web-based electronic mail service provider known as Gmail, Google Inc. ("Google"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. **The account to be searched is: jacques.monsi@gmail.com.** As described below, the subscriber of Jacques.monsi@gmail.com, hereinafter referred as the **TARGET E-MAIL ADDRESS**, is Jacques **MONSIEUR** AKA ("The Field Marshal"), a citizen of Belgian descent who primarily lives in Belgium and travels frequently to the Islamic Republic of Iran.

4. As described in detail below, I have probable cause to believe that **MONSIEUR**, the subscriber in control of the email account identified above, has committed the following criminal offenses in violation of United States law:

> Unlawfully and willfully exporting, re-exporting, causing the export, and re-export of goods from the United States to Iran without a license, in violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1705, and the Iranian Transaction Regulations, 31 C.F.R. §§560.203 and 560.204.

5. More specifically, I have probable cause to believe that between on or about February of 2009 to May 2009, **MONSIEUR** has actively been attempting to procure U.S. technology and equipment to illegally export from the United States to Islamic Republic of Iran.

6. This affidavit is based upon information supplied to me by other law enforcement officers, my personal involvement in this investigation, and on my training and experience. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the requisite probable cause.

7. I believe that the facts set forth herein establish probable cause to believe that evidence of exportation of U.S. origin goods to Iran and a conspiracy to export U.S. origin goods to Iran in violation of Title 18, United States Code, Section 371, the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1705, and the Iranian Transactions Regulations, 31 C.F.R. Part 560, will be found in these email accounts.  Additionally, I believe that the facts set forth herein also establish probable cause that the fruits of these crimes or things otherwise criminally possessed, and/or property derived or intended for use or which has been used as the means of committing these criminal offenses will also be found in these accounts.

**SUMMARY OF LAW AND REGULATIONS**

8. Beginning in 1995, the United States has imposed export

restrictions on Iran as a result of its sponsorship of
international terrorism and active pursuit of weapons of
mass destruction. Pursuant to the authority under IEEPA, 50
U.S.C. §§ 1701-1706, the United States has prohibited
certain transactions with Iran by U.S. persons or involving
U.S. goods through Presidential Executive Orders and
corresponding federal regulations. IEEPA authorizes the
President to impose unilateral economic sanctions,
including export prohibitions, upon a presidential
declaration of an unusual and extraordinary threat to
national security caused by a foreign threat.

9. In 1995, under the authority of IEEPA, President
Clinton issued two executive orders that prohibited United
States involvement with petroleum development in Iran and
imposed strict economic restrictions on trade with Iran.

10. On August 19, 1997, under the authority of IEEPA and
the National Emergency and Development Cooperation Act,
President Clinton issued Executive Order 13059 to "deal
with the unusual and extraordinary threat to national
security, foreign policy, and economy of the United States"
posed by the actions and policies of the Iranian
Government. Executive Order 13059 prohibits, among other
things: "the exportation, re-exportation, sale, or
supply, directly or indirectly, from the United States, or
by a United States person, wherever located, of any goods,
technology, or services to Iran or the Government of
Iran, including the exportation, re-exportation,
sale, or supply of any goods, technology, or services to a
person in a third country undertaken with knowledge or
reason to know that such goods, technology, or services are

intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran; [and] ...any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this Order."

11. Subsequently, to implement Executive Order 13059, the United States Department of Treasury, in consultation with the Secretary of State, promulgated the Iranian Transactions Regulations, codified at 31 C.F.R. Part 560. These regulations generally prohibit the export of goods or technology from the United States to Iran without having first obtained an export license from the United States Department of Treasury, Office of Foreign Asset Control ("OFAC").

12. More specifically, Section 560.204 prohibits (absent certain inapplicable exceptions): the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, re-exportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that: (a) [such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran ...31 C.F.R. § 560.204. In addition, Section 560.203 prohibits [any transaction by any United States person or within the

United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained [in the Iranian Transactions Regulations]...31 C.F.R. § 560.203.

13. At all times relevant to the facts set forth in this affidavit, the President has continued the national emergency with respect to Iran and Executive Order 13059, determining that the actions and policies of Iran continue to threaten the national security, foreign policy and economy of the United States.

14. Violation of, or conspiring to violate, Executive Order 13059 or any of the Iranian Transactions Regulations (31 C.F.R. 7 Part 560) is a federal felony punishable by up to twenty years imprisonment under the criminal provision of IEEPA. See 50 U.S.C. § 1705 ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter... A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of [one of these unlawful acts] ... shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than twenty years, or both.").

15. In addition, for all exports of any commodity valued at or above $2500.00 or for which an export license is required for shipment outside of the United States, an exporter is required to file a Shipper's Export Declaration ("SED"). This document requests information regarding the

identities and addresses of the U.S. shipper/exporter, ultimate consignee/end-user, any intermediary consignee or forwarding agent as well as the country of ultimate destination, the export route including ports of export and unloading (import), and a complete description of the item or items being shipped including their value. An agent of the exporter or shipper is required to sign the SED and certify that the information provided in that document is true and correct. Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of export documents, including SEDs, is a violation of the EAR (15 C.F.R. §764.2(g)(1)(ii)), IEEPA, and 18 U.S.C. §1001.

16. 18 USC 1956 (1)(A)(i)- Laundering of Monetary Instruments -Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity

17. 18 USC 554 (a) Smuggling of Goods from the United States -Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined

under this title, imprisoned not more than 10 years, or
both.

**FACTS SUPPORTING PROBABLE CAUSE**

**I. Background**

18. In June 1993, the United Kingdom's law enforcement
agency known as Her Majesty's Revenue and Customs (HMRC)
provided ICE (formerly U.S. Customs) the original
investigative lead identifying **MONSIEUR's** illegal
activities based on its interception of two electron tubes
being returned to the U.S. for repair.  The accompanying
documents listed the consignors as the Islamic Republic of
Iran Air Force (IRIAF) and the consignee as PENTA
LABORATORIES of California.  A document signed by Jacques
**MONSIEUR** from the Belgium shipper MATIMCO SPRL was found
with the shipment which directed that the identity of the
consignor (IRIAF) be concealed from government authorities.

19. According to investigative findings, **MONSIEUR** was born
on March 31, 1953 in Belgium.  Investigative findings
indicate that **MONSEIUR** has been active in arms trading
since the late 1980's earlier 1990's.  During U.S. Customs
investigation in 1993 several attempts were made to gather
evidence against **MONSIEUR**, MATIMCO and PENTA LABORATORIES.
However, based on investigative reports PENTA LABORATORIES
appeared to be reluctant to assist in U.S. Customs
investigations and attempts were made but unsuccessful to
gather additional documents to show imports/exports to
Iran.  The investigation was closed during this time,

20. A search of ICE'S data bases from 1994 to 2008
indicates that **MONSEIUR** name did not appear in any
investigations directly trying to procure of U.S.
technology.  However, in February of 2009, MONSEIUR name
surfaced again attempting to violate U.S. embargo laws,
when MONSEIUR contacted an undercover agent assigned to
ICE's undercover operation known as SKYMASTER.  The
undercover agent, hereinafter known as (U/C 1), began e-
mail communication with **MONSIEUR** at **TARGET E-MAIL ADDRESS**.
In the e-mails **MONSIEUR** is requesting engines for the F5
airplane.  These engines are known as "J85" models and
based on conversations with other intelligence and law
enforcement officers the U.S. Made F5 airplane was a model
sold to Iran by the United States prior to the sanctions of
1995.

21.  On March 14, 2009, U/C 1 and SS/A Lindy Savelle were
in France meeting with a confidential source.  During this
meeting the confidential source advised U/C 1 that MONSIEUR
was in town and would be stopping by to meet with U/C 1.
MONSEIUR arrived and met with U/C 1 as Savelle witnessed
the meeting from another location.  U/C 1 indicated that
MONSIEUR indicated that he specifically wanted to acquire
General Electric (GE) J85-21 engines for the F-5 (E/F) jet
fighter manufactured by Northrop Grumman and sold to IRAN
by the U.S. prior to the Islamic Revolution.  U/C 1
indicated to MONSIEUR the price of the engines and **MONSEIUR**
spoke about shipping the engines from the U.S to another
country that also has F-5's and transship them from there.
U/C 1 asked MONSIEUR if the engines are shipped to South
America would he, **MONSEIUR**, take over transshipment of the

engines from there.  MONSEIUR stated "if you know who I am
then you know where they are going to".  "Everyone knows me
around the world and who my clients are."  (investigative
findings and information from confidential sources show
**MONSIEUR'S** primary business associate as IRAN).  **MONSEIUR**
then stated that he would provide U/C 1 with an end user
certificate (EUC) in order to prepare the export license
requirement.

22. On April 7, 2009, **MONSEIUR** e-mailed U/C 1 from the
**TARGET E-MAIL ADDRESS** indicating that "all the offices in
his clients country were closed during the 3 weeks because
of their New Years Holiday.  They started to work again
only last Saturday."  Research of Iran holidays indicated
that IRAN celebrates its new years holiday for several
weeks beginning on March 21, 2009.  **MONSIEUR** thanked U/C 1
for providing a detailed inventory of spare parts for the
F-5 airplane and parts for a C 130 airplane.  **MONSEIUR**
indicates that he has been given the green light by his
clients to purchase the two (2) J85 engines for the F-5
provided by U/C 1.

23.  On April 16, 2009, **MONSEIUR** e-mailed U/C 1 from the
**TARGET E-MAIL ADDRESS** asking the location of an airfield in
Mobile, Alabama to land a cargo plane to load the engines.
**MONSEIUR** also asked U/C 1 for dimensions on all the boxes
and containers of parts to be loaded on the cargo plane.
U/C 1 responded, providing MONSEIUR the airport code in
Mobile, Alabama and dimensions on the crates.  On April 21,
2009 MONSEIUR responded stating that he intends to organize
a flight from Alabama to "your" official End User Country
(EUC).  MONSEIUR then indicates that he will contract a

cargo plane to fly to a ~~county~~ Country in South America for refueling only and then travel to Mobile, Alabama.  U/C 1 indicated to your affiant that the purpose of this is so that U.S. Law Enforcement will believe that the plane originated in a friendly country and not from IRAN.

24.  On May 5, 2009, **MONSEIUR** sent an e-mail to U/C 1, from the **TARGET E-MAIL ADDRESS**.  **MONSEIUR** stated that he had finally returned to Europe from his clients country.  He requested additional U.S. made military items for U/C 1 to locate and also requested a meeting somewhere in Europe to finalize a contract.  **MONSEIUR** indicated that once the contract is completed, money will be wired to U/C 1's U.S. bank account to procure the requested items.  **MONSEIUR** indicated to U/C 1 that this can not be done over the phone or by e-mail.

25. During this investigation, from February 23, 2009 to May 5, 2009, U/C 1 has received approximately 14 e-mails from **MONSEIUR** using the **TARGET E-MAIL ADDRESS**.  These e-mails were always signed with the names "Jacques MONSIEUR", "Jacques M" or "Jacques".  All e-mails referenced the procurement of U.S. made items and were relevant to the conversation to the meeting on Mach 14, 2009 in France with MONSIEUR.  In addition, U/C 1 recorded a conversation with **MONSEIUR** in March of 2009 on the telephone following e-mail communication about acquiring parts over the **TARGET E-MAIL ADDRESS**.

26. Beginning on May 1, 2009, letters were faxed to

GOOGLE'S legal department requesting that the contents of email the **TARGET E-MAIL ACCOUNT** be preserved pursuant to 18 U.S.C. §2703(f).

27. Based on my training and experience, and information provided to me by other law enforcement agents, I know the following: First, searches of email accounts usually provide information that help identify the user(s) of the email accounts. Second, individuals who use email in connection with criminal activity, or activity of questionable legality, often set up an email account or accounts for that purpose. This is often part of an effort to maintain anonymity and to separate personal communications from communications and information that is related to the criminal activity. Third, a search of an email account that is predicated on a specific violation often uncovers evidence of other violations of a similar nature. Finally, when the criminal violation involves a conspiracy, a search of an email account often allows the identification of co-conspirators.

In the instant case, the search of **MONSEIUR**'s email account may result in identification of their associates in Iran or in the United States who were also involved in his illegal procurement efforts.

**TECHNICAL BACKGROUND**

28. GOOGLE provides e-mail services free of charge to internet users. Subscribers obtain an account by providing basic information, such as name, gender, zip code and other

personal/biographical information. GOOGLE does not verify
the information the subscribers provide.

29. GOOGLE subscribers may access their accounts on the
company's e-mail servers from any computer connected to the
internet.

30. GOOGLE maintains electronic records relating to their
subscribers. These records include account application
information, account access information, and e-mail
transaction information.

31. When a GOOGLE/GMAIL subscriber sends an e-mail, it is
initiated at the subscriber's computer, transferred via the
internet to e-mail provider's servers, and then transmitted
to its end destination. GOOGLE/GMAIL users have the option
of saving a copy of the sent e-mail.

32. Any e-mail that is sent to a GOOGLE/GMAIL subscriber is
stored in the subscriber's "mail box" on the company's e-
mail servers until the subscriber deletes the e-mail or the
subscriber's mailbox exceeds the e-mail service provider's
storage limits.  The current storage limit on an average
account is 7.3 gigabytes per account.  Based on the volume
of e-mails, valuable evidence could be deleted by GOOGLE.

The same may be true of an e-mail the subscriber sends, as
well, if the subscriber chooses to store "sent e-mail." If
the subscriber does not delete the message, the account is
below the maximum limit, and the subscriber accesses the
account periodically, that message can remain on
GOOGLE/GMAIL servers indefinitely.

33. A GOOGLE/GMAIL subscriber can also choose to store files, including e-mails, data, and image files, on servers maintained or owned by the e-mail service provider if the subscriber's computer has insufficient storage space or if the subscriber does not want to keep the files on his or her personal computer.

**LEGAL AUTHORITY**

34. The government may obtain both e-mail content and subscriber information from an e-mail provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

35. Any court with jurisdiction over the offense under investigation may issue a §2703 search warrant, regardless of the location of the e-mail provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

36. If the government obtains a search warrant, there is no requirement that the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

**CONCLUSIONS**

37. Based on the information described, I have probable cause to believe that MONSEIUR who utilizes the **TARGET E-MAIL ADDRESS** has violated or is attempting to violate the International Emergency Economic Powers Act, Title

50, United States Code, Sections 1702 and 1705, and the
Iranian Transactions Regulations, 31 C.F.R. §§ 560.203 and
560.204.

38. Based on the information described above, I have
probable cause to believe that computer systems owned or
operated by Gmail, Google Inc. ("Google"), headquartered at
1600 Amphitheatre Parkway, Mountain View, CA  94043, hold
records that contain evidence of these crimes.

39. Based on the information described above, I have
probable cause to believe that the evidence of violations
of 50 U.S.C. § 1705 and the Iranian Transactions
Regulations includes e-mail content and other records, as
more fully described in Attachment A to the search warrant.

40. The procedures that will be used to copy and review the
relevant records are set out in Attachment A to the search
warrant.

**ORDER SEALING THE WARRANT AND**
**PRECLUDING NOTICE TO SUBSCRIBER**

41. I request that this Application and Warrant be sealed
by the Court until such time as the Court directs
otherwise. I further request that, pursuant to 18 U.S.C. §
2705(b), the Court order Google/GMAIL **NOT TO NOTIFY** any
person (including the subscriber or customer to which the
materials relate) of the existence of this Application, the
Court's warrant, or the execution of the warrant unless and
until authorized to do so by the Court. Such an Order is
justified because notification of the Application, the

Court's warrant or the execution of the warrant could
seriously jeopardize the ongoing investigation. Such
disclosure could give the subscriber an opportunity to
destroy evidence, notify confederates, or flee or continue
flight from prosecution.

Angelo Fermo
Senior Special Agent
Department of Homeland Security
Immigration and Customs Enforcement (ICE)

Sworn and subscribed before me this 6th day of May 2009.

UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT "B"**

**I. Accounts and Files to Be Copied by GOOGLE/GMAIL Personnel**

A. All electronic communications, images, and data files associated with the e-mail addresses or accounts designated Jacques.monsi@gmail.com

B. All transactional records for the E-mail addresses or accounts designated Jacques.monsi@gmail.com including:

1. Subscriber information for the accounts designated Jacques.monsi@gmail.com:

a. Name(s) and e-mail address(es);
b. Address(es);
c. Records of session times and durations;
d. Length of service (including start date) and types of service utilized;
e. Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;
f. The means and source of payment for such service (including any credit card or

bank account number); and

g. The Internet Protocol address used by
the subscriber to register the account
or otherwise initiate service.

2. User connection logs for any connections to
or from the account including:

a. Connection time and date;

b. Disconnect time and date;

c. The IP address that was used when the
user connected to the service;

d. Source and destination of any electronic
mail messages sent from or received by
the account, and the date, time, and
length of the message; and

e. Any address to which electronic mail was
or is to be forwarded from the account
or e-mail address.

**III. Records and Data to be Searched and Seized by Law
Enforcement Personnel**

A. All electronic communications, images, and data,
for the period October 1, 2008 to present relating
to:

1. Electronic mail and other content identifying
in any manner the user(s) of the email
account;

2. Electronic mail and other content relating to orders for
goods technology, or services of U.S. origin and the end-
user or potential use for those items of services;

3. electronic mail and other content referring to any
manner to, or reflecting, any transaction or prospective

transaction in violation of the International emergency economic Powers Act, 50 U.S.C. 1705, or the Iranian Transactions Regulations, 31 C.F.R. 560.203 and 560.204;

B.  All of the transactional records described in Section II (B).